UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


COMPREHENSIVE CARE
CORPORATION,

       Plaintiff,

v.                              Case No.: 8:09–cv–01375–T–24–TBM

JERRY KATZMAN,

       Defendant.
_____/

JERRY KATZMAN, JARED KATZMAN,
LEE KATZMAN, MICHELLE KATZMAN,

       Counter-Plaintiffs,

v.

COMPREHENSIVE CARE
CORPORATION,

       Counter-Defendant.
_____/

**ORDER DENYING**
**<u>SUMMARY JUDGMENT</u>**

      The Court now considers the Amended Motion for Final Summary Judgment filed by

Jerry Katzman and his adult children, Jared, Lee, and Michelle Katzman.[1]  (Doc. 184.)

Comprehensive Care Corporation opposes the motion.  (Doc. 196.)

---

[1] Although captioned as a final summary judgment motion, the motion only seeks partial summary judgment because Katzman did not move for summary judgment on the unjust enrichment claim in Count IV of the Amended Counter-Claim.

# BACKGROUND[2]

This case grows out of a fractured relationship between Jerry Katzman and Clark Marcus, the co-CEO of Comprehensive Care Corporation.  Before this lawsuit, Katzman and Marcus had worked together for two decades.  Marcus had "the highest regard" for Katzman, who was one of the "brightest and most hard working persons" he had known.[3]  Marcus personally loaned Katzman money, and Katzman, an opthamologist, performed eye surgery on Marcus.[4]  But in 2009, the working relationship between Katzman and Marcus began to break down when they started at a struggling managed care company, Comprehensive Care.  Comprehensive Care was approximately 40 years old but, according to Marcus, the company was nearly bankrupt in 2009 and operated more like a start-up firm.  At first, Marcus and Katzman worked for the company in an unofficial capacity.  Although Comprehensive Care argues that it never hired Katzman as a consultant between January and May 2009, Comprehensive Care paid Katzman $50,000 during this period.  Even at this early stage, Marcus was dissatisfied with Katzman's work.  Beginning in January 2009, Marcus said he noticed changes in Katzman.  Katzman was under "economic stress" from a bitter divorce and was "preoccupied" with a disciplinary proceeding in New York that threatened his medical license.[5]  Marcus also said he thought something was "medically wrong" with Katzman.  Katzman had "embarked on a medical regime" involving unspecified

---

[2] The Court includes this background only to provide context—not to make findings of fact.  Rule 56 requires that the Court view all facts and draw all reasonable inferences in the light most favorable to the non-moving party.  The Court has done this.

[3] Marcus Dep. at 77.  This refers to Marcus' deposition of May 11, 2010.

[4] Marcus Dep. at 52-56.

[5] Marcus Dep. at 70-80.

human growth hormones that affected his ability to focus.[6]  (Katzman denies these allegations.)
As a result of Katzman's change, Marcus testified that Katzman did not complete tasks he was
assigned.[7]  At an April 2009 presentation to the National Association of Black County Officials
("NABCO") in Miami, Marcus thought Katzman embarrassed the company with his poor
performance.[8]  Marcus said the company had to scramble to recover from the damage Katzman
had done at the NABCO meeting.

Despite Marcus' misgivings, the board of directors of Comprehensive Care hired
Katzman as vice president of strategic development on May 11, 2009.  Marcus, who was hired as
co-CEO on the same day, did not object.  According to Marcus, the company's board of directors
consisted of sophisticated business executives from Fortune 500 companies well-versed in
corporate governance.[9]  No one questioned the decision to hire Katzman or discussed Marcus'
concerns about his performance, according to the board minutes.  The board also voted to issue
Katzman stock warrants as part of his equity compensation.  Comprehensive Care issued the
warrants to Katzman's adult children, Jared, Lee and Michelle Katzman, on May 13, 2009.

 Comprehensive Care also paid Katzman a $70,000 signing bonus.[10]  The Employment
Agreement called for Katzman to receive a $390,000 annual salary for the first year of the three-
year agreement, but Comprehensive Care did not actually have to pay Katzman cash until the
company had sufficient revenues.  Katzman's salary would increase, at a minimum, each year to

---

[6] Marcus Dep. at 78.

[7] Marcus Dep. at 89-89.

[8] Marcus Dep. at 83-86.

[9] Marcus Dep. at 131.

[10] Doc. 196-2 ¶ 12.

reflect the increase in the cost of living.  Katzman was also entitled to customary fringe benefits,

including stock options and indemnification to defend against any claims connected, even

indirectly, to his employment.

Once the Employment Agreement took effect, the already-strained relationship between

Katzman and Marcus worsened.  Marcus testified that in his opinion Katzman did not give his

best efforts to the job, and appeared distracted by personal matters—including the disciplinary

proceeding in New York, which Marcus, a lawyer, helped Katzman with informally.  Marcus

testified that Katzman made personal phone calls and worked on a side business, called ECS,

when Katzman should have been working for Comprehensive Care.  The company also claims

Katzman traded stocks during the day, although Katzman testified that he never traded stocks but

did take phone calls from his broker.[11]  On at least one occasion, Katzman could not be reached

by phone for two hours, Chief Financial Officer Giuseppe Crisafi testified.  At a board meeting

on July 7 and 8, 2009, several board members testified that Katzman looked distracted and

seemed "out of the loop."  Katzman offered one business idea that demonstrated that Katzman

did not understand how Comprehensive Care's business worked.[12]  In June and July 2009, e-

mails showed Marcus' growing dissatisfaction with Katzman.  Marcus warned Katzman about

the seriousness of the problem.  In June 2009, he told Katzman to move to the Tampa Bay area

to be closer to the office.  Katzman signed a lease to rent a unit in the Redington Shores Yacht &

Tennis Club, about 45 minutes from Comprehensive Care's Tampa office.[13]  When Katzman told

---

[11] Katzman Dep. at 178-188.

[12] Katzman claims that Marcus told him to remain silent at the board meeting.  But he acknowledges being distracted—he was expecting a phone call from his sister about the outcome of brain surgery on his brother-in-law, who had a ruptured aneurism.  Katzman Dep. at 148-151.

[13] Doc. 199-1.

Marcus he would work out of Tampa beginning July 20, 2009, Marcus warned Katzman that he made the move at his own risk.  On July 17, 2009, Marcus gave Katzman an ultimatum: waive your rights to sue under the Employment Agreement and take a job as a consultant for $200,000, or be fired.  Katzman refused to waive his rights.

The next day, Saturday, July 18, 2009, the board of directors voted to terminate Katzman and cancel the stock warrants issued to his children.  In a letter dated July 19, 2009, Comprehensive Care terminated Katzman for misconduct under Section 4(c) of the Employment Agreement and for misrepresentations under Section 4(d).  The termination notice said that Comprehensive Care was terminating Katzman "for cause" because he had "failed to perform [his] job in a satisfactory manner."  The notice said that Comprehensive Care had provided Katzman with oral and written notices of his failure to perform, but did not specify the dates of the notices and whether the notices were sent by registered or certified mail as required by Section 8 of the Employment Agreement.  The letter provided a "sampling" of Katzman's "misconduct," including Katzman's apparent disinterest during the July 2009 board meeting and his "lack of preparation" for the NABCO presentation in April.[14]

The next day, on July 20, 2009, Comprehensive Care filed a Complaint in U.S. District Court against Katzman and Katzman's three adult children, who were named as John Doe defendants because Comprehensive Care claimed that the children's "exact identities are unknown."  The Complaint contains two counts.  Count I alleged that Katzman committed fraud in the inducement by falsely representing that he would work full-time when he had no intention of doing so.  Count II alleged that Katzman breached his Employment Agreement by failing to

---

[14] The NABCO meeting took place in April 2009 before the Employment Agreement took effect in May 2009, and therefore it cannot be a basis for termination.  Doc. 184-7 at 6.

work full-time and with his best efforts.  Comprehensive Care sought damages, rescission of the

Employment Agreement, and the return of all of Katzman's compensation, including the $70,000

signing bonus and the stock warrants.[15]

On December 11, 2009, Katzman filed a Counter-Claim, which he later amended.  Count

I of the Amended Counter-Claim alleged that Comprehensive Care breached the Employment

Agreement by terminating him without cause.  In Count II, Katzman and his children, Jared, Lee

and Michelle Katzman, alleged that Comprehensive Care breached the "Stock Warrant

Agreement" by cancelling the warrants.  In Count III, the Katzmans sought  a declaratory

judgment about their rights to the warrants.  In Count IV, Katzman alleged that Comprehensive

Care unjustly enriched itself by failing to compensate him for services and by failing to

reimburse him for business expenses.  Count V alleged that Comprehensive Care failed to

indemnify Katzman for all claims against him as required by the Employment Agreement.[16]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."[17]  The Court must draw all

inferences from the evidence in the light most favorable to the non-moving party and resolve all

reasonable doubts in that party's favor.[18]  Therefore, the moving party bears the initial burden of

---

[15] A dispute over a different set of stock warrants is pending in this Court before The Honorable James D. Whittemore.  See Comprehensive Care Corporation v. Jerry Katzman & Margaret "Peggy" Husted, Case No. 8:10-cv–00942-T-27-TGW.

[16] The Court dismissed without prejudice Count VI, an invasion of privacy claim; Katzman did not re-file it.

[17] Fed. R. Civ. P. 56(c).

[18] Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Id.  When the moving party has discharged its burden, the non-moving party—in this case, Comprehensive Care—must then go beyond the pleadings, and by her own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue of material fact for trial.  Id.

The court "must avoid weighing conflicting evidence or making credibility determinations" at the summary judgment stage.  "It is not the role of the court to weigh the facts.  Rather the determination is of whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[19]

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[20]  In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[21]  In addition, a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[22]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . .  The mere

---

[19] Hilburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1225 (11th Cir. 1999) (internal quotations and citations omitted).

[20] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

[21] Id. at 251-52.

[22] Id. at 248.

existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."[23]

Under Rule 56, the Court may also enter a partial summary judgment order that narrows the issues for trial.[24]  Because eliminating those issues where no genuine issue of material fact exists will focus the trial, the Court will dispose of certain issues undisputed as a matter of law.

## ANALYSIS

I.   **Complaint Count I: The Economic Loss Rule Does Not Bar the Fraud in the Inducement Claim.**

Florida's economic loss rule does not bar the fraud in the inducement claim in Count I of the Complaint because the Florida Supreme Court has carved out an exception to the rule for claims such as this one.

Florida's economic loss rule rests on the "difference between contract law—which protects expectations—and tort law—which is determined by the duty owed by all persons to others in society."[25]  Because contract law is better suited to resolving disputes over purely economic losses, the Florida Supreme Court has found that the economic loss rule bars tort claims for economic losses without personal injury or property damage.[26]  The rule also rests on "the assumption that the parties to a contract have allocated the economic risks of

---

[23] Id. at 249-50, 252.

[24] 10B Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 2737 (3d ed. 2010).

[25] Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co., 208 F. Supp. 2d 1310, 1315 (S.D. Fla. 2002) (citing Casa Clara Condo. Ass'n v. Charley Toppino & Sons, 620 So. 2d 1244 (Fla. 1993) and Medalie v. FSC Secs. Corp., 87 F. Supp. 2d 1295 (S.D. Fla. 2000)).

[26] Id. (citing Strickland-Collins Constr. v. Barnett Bank of Naples, 545 So. 2d 476 (Fla. 2d DCA 1989); Keys Jeep Eagle, Inc. v. Chrysler Corp., 897 F. Supp. 1437, 1443 (S.D. Fla.1995).  See also Fla. Power & Light Co. v. Westinghouse Elec. Corp., 510 So. 2d 899, 902 (Fla. 1987) (announcing economic loss rule).

nonperformance through the bargaining process."[27]  But the Supreme Court has drawn an

exception for several claims, including for fraud in the inducement claims.[28]  In HTP, Ltd., et al.

v. Lineas Aereas Costarricenses, S.A.,[29] the Florida Supreme Court held that the economic loss

rule did not prevent a fraud in the inducement claim from existing separately from a breach of

contract claim where the fraudulent acts could be "considered to be independent from acts that

breached the contract."[30]  The Supreme Court reasoned that fraud in the inducement usually

occurs before parties enter a contract; breach of contract occurs after a contract is formed.  While

contract law protects a party's expectation interest in getting the benefit of a bargain, "the

interest protected by fraud is society's need for true factual statements in important human

relationships, primarily commercial or business relationships."[31]

        Since HTP, Ltd., Florida's appellate courts have split in how they apply the economic

loss rule to fraud in the inducement claims.  Relying on the distinction in HTP, Ltd. between

"fraud extraneous to the contract and fraud interwoven with the contract," some appellate courts

have found that the economic loss rule bars a fraud in the inducement claim where the fraud

occurs in the performance of the contract or where the fraudulent representations become part of

the contract.  But in this case, Katzman's conduct allegedly creating the fraud was "separate and

---

[27] Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 536 (Fla. 2004).

[28] Florida's economic loss rule does not bar the tort of negligent misrepresentation, negligence, negligent maintenance and inspection by a third-party outside of contract.  See PK Ventures, Inc. v. Raymond James & Assocs., 690 So. 2d 1296 (Fla. 1997) (negligent misrepresentation); Moransais v. Heathman, 774 So. 2d 973 (Fla. 1999) (negligence); Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 536 (Fla. 2004) (negligence outside of privity).

[29] 685 So. 2d 1238, 1239 (Fla. 1996).

[30] Id.

[31] Id. (adopting and quoting from Judge Albenbernd's dissent in Woodson v. Martin, 663 So. 2d 1327 (Fla. 2d DCA 1995) (en banc)).

distinct" from the conduct that allegedly breached the Employment Agreement.[32]  Katzman's

alleged fraud was his intention, at the time of signing the Employment Agreement, never to

perform under it.  This fraud was, therefore, "extraneous to the contract."  It occurred before

Katzman signed the Employment Agreement.  While Katzman's failure to perform under the

Employment Agreement may be *evidence* of his fraudulent intention, the two actions are still

distinct.  The tort rests on a false promise to perform; the breach of contract claim rests on the

actual failure to perform.  "If the alleged fraud . . . relates to a misrepresentation which caused

the plaintiff to enter into the agreement, then such fraud would be fraud in the inducement,

which will not be barred by the economic loss rule."[33]   Because the economic loss rule does not

bar the fraud in the inducement claim, Count I survives summary judgment.

## II.  __Complaint Count II__: Comprehensive Care's Breach of Contract Claim Survives Summary Judgment.

### A.  *Comprehensive Care Seeks Rescission as the Remedy for Breach of Contract.*

Pleaded under the caption "Breach of Contract," Count II of Comprehensive Care's

Complaint seeks rescission of the Employment Agreement based on Katzman's alleged

misrepresentations and "fraudulent acts."   Count II of the Complaint reads in part:

> 21.   In the alternative to Count 1, Plaintiff alleges that Defendant has breached the Employment Agreement.  Defendant breached the agreement by refusing to perform [his] obligations under the contract.  Specifically, he failed to work full-time as agreed and failed to utilize his best efforts in his position as an executive.

---

[32] Taylor v. Maness, 941 So. 2d 559, 564 (Fla. 3d DCA 2006).

[33] Reese v. JPMorgan Chase & Co., 686 F. Supp. 2d 1291, 1302-03 (S.D. Fla. 2009) (quoting D&M Jupiter, Inc. v. Friedopfer, 853 So. 2d 485, 488 (Fla. 4th DCA 2003)).
See Noack v. Blue Cross & Blue Shield of Fla., Inc., 742 So. 2d 433, 434-35 (Fla. 1st DCA 1999) (holding that a merger clause does not bar a fraud in the inducement claim) ("The trial court's order holds that Noack's claim alleging fraud in the inducement is barred by the economic loss rule; this holding is error, for our court holds that '[f]raud in the inducement to make a contract is not barred by the economic loss rule.'").
See also Nautica Int'l, Inc. V. Intermarine, U.S.A., L.P., 5 F. Supp. 2d 1333, 1347 (S.D. Fla. 1998).

> 23.   . . . To avoid unjust enrichment of the Defendant based on his fraudulent acts, Plaintiff seeks rescission of the contract and a return of all compensation paid to Defendant.  Absent rescission of the contract, no adequate remedy exists at law to redress Plaintiff for Defendant's fraudulent conduct.[34]

Rule 8(e) of the Federal Rules of Civil Procedure instructs a court to construe a pleading "so as to do justice."  In doing this, the Court notes that Comprehensive Care opted in Count II of the Complaint for a rescission remedy, rather than damages.  Comprehensive Care also pleaded Count II of the Complaint as an alternative claim to Count I, the fraud in the inducement claim.[35]  Therefore, the Court construes the breach of contract claim Count II to seek the equitable remedy of rescission, which can only be awarded if the breach of contract constitutes fraud.[36]

**B.**     *Factual Issues Remains Whether Employment Agreement Should Be Rescinded.*

A genuine issue of material facts exists for the fact finder to decide whether or not the Employment Agreement should be rescinded.[37]  Rescission is a harsh remedy, disfavored by the courts.[38]  Courts have discretion whether or not to order rescission even if a party proves the

---

[34] Doc. 1 ¶ ¶ 21-23.  Katzman did not file a motion to dismiss based on the pleadings; therefore, Katzman has waived arguments about pleading deficiencies in the Complaint.

[35] The Economic Loss Rule does not bar a rescission claim because recession is a contractual claim, not a tort.  Rubesa v. Bull Run Jumpers, LLC, No. 09-CV-81107, 2010 WL 376320, at *3 (S.D. Fla. Jan. 26, 2010).

[36] Count II also attempts to plead an unjust enrichment claim.  However, an unjust enrichment claim cannot be plead if an express contract, such as the Employment Agreement in this case, exists.  Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. 5th DCA 1998).

[37] The elements of a rescission claim are: (1) the character or relationship of the parties; (2) the making of the contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) lastly, that the moving party has no adequate remedy at law.  Crown Ice Machine Leasing Co. v. Sam Senter Farms, Inc., 174 So. 2d 614, 617 (Fla. 2d DCA 1965).

[38] Rood Co. v. Bd. of Pub. Instruction of Dade Cnty., 102 So. 2d 139, 142 (Fla. 1958) ("Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed.  Because of this view, this Court has held that slight circumstances indicating a

elements.[39]  Moreover, where the party seeking rescission has itself acted wrongly, courts may

decline to order rescission.[40]  In addition,  "a contract will not be rescinded even for fraud when

it is not possible for the opposing party to be put back into his pre-agreement status quo

condition."[41]

Assuming that the Court is willing to order rescission, Comprehensive Care must first

prove fraud or false representations.[42]  Generally, a promise to perform future services cannot be

grounds for false representation unless the moving party, in this case Comprehensive Care, can

prove Katzman had no intention of performing the services at the time in May 2009 that he made

the promise to do so.[43]  Comprehensive Care offers as evidence that Katzman had no intention to

perform under the agreement evidence of Katzman's failure to perform: Katzman's failure to

work in the Tampa office regularly, his inability to be reached by phone at times, and the

---

purpose or intent of the claimant to waive the right will bar relief.").

[39] Billian v. Mobile Corp., 710 So. 2d 984, 990-91 (Fla. 4th DCA 1998).  In Billian, the 4th District said, "Rescission is not available as a matter of right.  Relief by way of rescission lies within the sound discretion of the court, to be exercised according to what is reasonable and proper under the circumstances of each particular case; and the court will, in granting relief, impose such terms as it deems the real justice of the case to require, the maxim being emphatically applied, he who seeks equity must do equity."  Id.

[40] Rood, 102 So. 2d at 142.

[41] Royal v. Parado, 462 So. 2d 849, 856 (Fla. 1st DCA 1985).

[42] "The elements that must be established to prove a claim of fraud are: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation."  Townsend v. Morton, No. 5D09-1223, 2010 WL 2218327, at *3 (Fla. 5th DCA June 4, 2010).

[43] Grounds for "rescission exists where at the time of execution of a contract, the party promising to perform an act in the future has a secret undisclosed intent not to carry it out, but fraudulently represents that he will perform as an inducement to the other party to enter into the contract."  Royal, 462 So. 2d at 855.
As the Eleventh Circuit has said, "Florida law is consistent with the general rule that an actionable misrepresentation must involve a false statement of a past or existing fact and not a promise to do something in the future.  However, Florida law recognizes several exceptions to this rule.  First, 'a promise is actionable as fraud only when the promisor had a positive intent not to perform his promise, or made the promise without a present intent to perform it.'"  Varnum v. Nu-Car Carriers, Inc., 804 F.2d 638, 642-43 (11th Cir. 1986) (Hoffman, J., specially concurring) (internal citations omitted).

assertion that he spent part of the day making personal calls and trading stocks.  Comprehensive Care argues that because Katzman did not *actually* work full-time, this proves he never had any intention of doing so.

Comprehensive Care also offers evidence that Katzman and his wife operated another, possibly competing, business called ECS in May 2009.  Comprehensive Care cites to the deposition testimony of Mathew Taylor of ECS who testified that he had "numerous" contacts with Katzman.  But a full reading of the deposition transcript shows that "numerous" contacts meant three or four conversations in 2009, a year in which ECS conducted no business.[44]

"Florida courts have been reluctant to grant summary judgment when fraud or misrepresentation is involved."[45]  These type of claims often turn on factual issues and judgments about witnesses' credibility.  Accordingly, "in fraud cases the issue of whether a defendant had the intention to perform an act at the time the promise was made is generally a jury question."[46]  Therefore, the Court finds that Count II of the Complaint survives summary judgment.

---

[44] Taylor Dep. at 37-41.

[45] Elmore v. Vatrano, 485 So.2d 888, 889-90 (Fla. 1st DCA.1986) ("Summary judgment is not a substitute for a trial; and fraud is a subtle thing requiring full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute fraud.  Since the whole context is necessary for the determination, it is seldom that one can determine the presence or absence of fraud without a trial.").

[46] Cabo Rico Yachts, Inc. v. Martinache, 21 So. 3d 131 (Fla. 3d DCA 2009) (citing Wadlington v. Cont'l Med. Servs., Inc., 907 So. 2d 631 (Fla. 4th DCA 2005)).
See also 10B Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 2730 (3d ed. 2010) ("The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind.") (internal quotations and citations omitted).

**III.**   **Amended Counter-Claim Count I: A Jury Issue Remains on Katzman's Claim that Comprehensive Care Breached the Employment Agreement by Firing Him.**

Katzman moves for summary judgment on Katzman's claim that Comprehensive Care breached the Employment Agreement by terminating him without "cause." While Comprehensive Care has not offered evidence sufficient for a jury to find that Katzman engaged in "misconduct in office," as specified in a written termination notice, under Section 4(c) of the Employment Agreement, Comprehensive Care has offered sufficient evidence for a jury to find that Comprehensive Care properly fired Katzman for failure to make materially accurate representations within the Employment Agreement itself under Section 4(d) of the Employment Agreement.

**A.**   *Section 4(c) of the Employment Agreement*

Section 4(c) permits Comprehensive Care to terminate Katzman for "misconduct in office," also referred to as "Termination for Cause." The Employment Agreement does not define "misconduct in office," but the term "termination for cause" has a well-settled meaning. As the Florida Supreme Court said in State ex rel. Hathaway v. Smith: "Removal for cause or terminations for cause is employed frequently in statutes and constitutions relating to the removal of officers and employees. . . . It imputes removal or termination for misconduct, some violation of the law or [dereliction] of duty on the part of the officer or employee affected."[47] As understood by the Florida Supreme Court and other courts, "misconduct" or "termination for cause" refers to illegal activity, ethical breaches, or utter abandonment or dereliction of a job.

---

[47] 35 So. 2d 650, 651 (Fla. 1948) (internal citations omitted).

Comprehensive Care has simply offered scant evidence of "misconduct in office," as that term is commonly understood.  Even Comprehensive Care's own witnesses admitted this point under oath.[48]  Instead, Comprehensive Care has only presented evidence that Katzman did a terrible job—that he was "out of loop" on company issues, unfamiliar with the company's business, mentally asleep at board meetings, unresponsive to client needs, and absent during the work day.   But even if true, these allegations do not amount to "misconduct in office."

Comprehensive Care offered one example of misconduct, but because the company did not specify this allegation in Katzman's termination notice, this cannot be grounds to fire Katzman under Section 4(c).  In a deposition, Chief Financial Officer Giuseppe Crisafi testified that Katzman submitted fraudulent expense reports to the company.  However, Section 4(c) only permits Comprehensive Care to terminate Katzman for misconduct if it specifies the misconduct in a termination notice.  Comprehensive Care never mentioned this issue in its termination notice.  After providing a "sampling" of examples of "misconduct," which were, in fact, examples of Katzman's poor performance, the notice read: "We do not believe it is in either party's interest to once again delineate all of your misconduct and poor performance over the past several months.  The Company is obviously prepared to do so if it becomes necessary."[49]

---

[48] For example, board member Joshua Smith testified in his deposition that he had not seen "misconduct, but just lack of involvement, lack of engagement, lack of interest."  Doc. 184-7 at 7.  Smith testified: "Jerry is not a bad guy, and I've never felt he was a bad guy, but he was out of left field from time to time, and I think his intent was to contribute, but, whatever was happening, it wasn't working."  Doc. 184-7 at 9-10.

Board member John Hill testified that Katzman was terminated for misrepresentation and performance issues, which meant "[p]rojects not completed.  Irregular attendance.  Not a lot of knowledge about what he was doing when he was in the office."  Doc. 184-6 at 4.

Aside from one instance of misconduct, which was not specified in Katzman's termination notice, Chief Financial Officer Giuseppe Crisafi said Katzman was "disengaged . . . was not giving his full-time attention to the corporation . . . did not even know the corporations' business . . . [and] was difficult to find."  Doc. 184-3 at 3-4.  Crisafi testified Katzman "appeared distracted, and he showed a very clear behavioral pattern that was not consistent with dedicating all his time and effort as an executive of a corporation. . . ."  Doc. 184-3 at 34-35.

[49] Doc. 184-5 at 51-52.

Comprehensive Care's decision not to specify Katzman's misconduct in the notice prevents the company from relying on misconduct allegations, raised later in litigation.  The Employment Agreement requires Comprehensive Care to "specify" the cause of termination so that Katzman can attempt to cure any breach.  Comprehensive Care did not give Katzman this chance.

In addition, Comprehensive Care did not give Katzman two weeks written notice, by registered or certified mail, before it terminated Katzman.  Comprehensive Care also did not give Katzman 30 days or longer to cure the alleged breach, as required by Section 4(c). Comprehensive Care argues that Section 4(c) did not require it to give Katzman 30 days to cure the breach because his poor performance "was not capable of being cured."  However, Comprehensive Care's opinion that Katzman would not improve does not relieve it of its obligation to afford Katzman the opportunity to attempt to do so.

**B.**     *Section 4(d) of the Employment Agreement*

Section 4(d) of the Employment Agreement permits Comprehensive Care to fire Katzman for misrepresentation within the Employment Agreement itself, without notice and without an opportunity to cure.  Section 4(d) reads:  "The failure of Executive's representations herein to be materially accurate shall give the Company the right to terminate Executive's engagement."  Katzman made numerous representations within the Employment Agreement, including a statement that he resided in Sunrise, Florida, and a promise to work "on a full-time basis" with his "best efforts" for Comprehensive Care.

For the reasons already discussed, a jury issue remains about whether Katzman's representations in the Employment Agreement were materially accurate.

**IV.**   **Amended Counter-Claim Counts II & III: A Jury Issue Remains on the Katzmans' Stock Warrant Claims.**

    **A.**   *Rescission Might Permit Comprehensive Care to Cancel the Stock Warrants.*

The Employment Agreement and the stock warrants are not wholly unrelated contracts, as the Katzmans assert.  The Court reaches this conclusion for two reasons.  First, if the stock warrants were issued independently from the Employment Agreement, then the stock warrants would be void for lack of consideration.  It is undisputed that Jared, Lee and Michelle Katzman did not pay or provide anything of value in exchange for the stock warrants.  Without consideration, the stock warrants are not legally enforceable contracts.  Without a valid contract, no breach can occur and no damages can result.  Second, the undisputed evidence shows that Comprehensive Care issued the stock warrants to Katzman's children as part of his compensation package.  On May 11, 2009, Comprehensive Care's board of directors approved the Employment Agreement, which provides in Section 2(c) that Katzman shall be entitled to all fringe benefits of the company, including stock options.  Section 15 also permits the parties to enter "such further instruments and documents . . . required to effectively carry out the transactions contemplated herein."  After approving the Employment Agreement, the board authorized the company to award Katzman stock warrants to purchase 100 Preference D shares of the company as a form of equity incentive compensation.[50]  On May 13, 2009, Comprehensive Care issued stock warrants to Katzman's adult children.  Neither party disputes this fact, and both acknowledge that the company in the past issued stock warrants to other executives' family members.

---

[50] Doc. 184-5.

The arrangement makes the Katzman children third-party beneficiaries of the Employment Agreement, which means that a rescission of the Employment Agreement would affect their rights.  "A party is an intended beneficiary [to a contract] only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong."[51]  A third-party beneficiary, however, does not need to know about the agreement at the time it is reached or be specifically named in the agreement.[52]  It is enough that both parties agree that they intend to benefit the third party.  In this case, it is undisputed Katzman and Comprehensive Care agreed to benefit Jared, Lee and Michelle Katzman by issuing the stock warrants to the children.  Although the Employment Agreement does not name the Katzman children as beneficiaries, the subsequent warrants do.  The Employment Agreement, by authorizing the company to issue "further instruments" to achieve its goals, creates an intention to benefit whoever is named in these additional instruments.  Because the warrants named the children, the Employment Agreement implicitly expressed an intention to benefit them.  As such, the Katzman children are third-party beneficiaries to the Employment Agreement.

As third party beneficiaries, Jared, Lee and Michelle Katzman have the right to enforce the Employment Agreement to the extent it affects their stock warrants.  But they must also suffer the result of any contractual or quasi-contractual claim, such as a rescission claim, made

---

[51] Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Inc., 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994) ("Additionally, in order to find the requisite intent, it must be shown that both contracting parties intended to benefit the third party. It is insufficient to show that only one party unilaterally intended to benefit the third party.").

[52] Calder v. Richardson, 11 F. Supp. 948, 949 (S.D. Fla. 1935) ("[T]he law operating upon the acts of the parties creates the essential privity between the promisor and the third person beneficiary . . . even though the primary purpose of the contracting parties was to benefit themselves, and the third party beneficiary was unaware of the contract at the time of its execution."). See also Technicable Video Sys., Inc. v. Americable of Greater Miami, Inc., 479 So. 2d 810, 811-12 (Fla. 3d DCA 1985).

against the agreement.  "A third party beneficiary's right of action on the promise cannot, however, rise higher than the rights of the contracting party through whom he claims."[53]  The third-party beneficiaries stand in the shoes of the original parties, for better or worse.  Therefore, because Comprehensive Care's rescission claim could be successful and could result in the return or cancellation of all of Katzman's compensation, the Court cannot enter summary judgment on the Katzmans' declaratory judgment and breach of contract claims in Counts II and III of the Amended Counter-Claim.

>    **B.**    *If Comprehensive Care's Rescission Claim Fails, Then No Genuine Issue of Material Facts Remains that Comprehensive Care Breached the "Stock Warant Agreement" By Cancelling the Stock Warrants.*

If a jury finds that Comprehensive Care cannot rescind the Employment Agreement, then the Court is left with a breach of contract counter-claim relating to Comprehensive Care's cancellation of the warrants.

As a preliminary matter, the Court notes that the stock warrants—despite their unique features—are legally enforceable contracts.  Although the Katzmans refer in their summary judgment motion to a breach of a "Stock Warrant Agreement," the warrants do not contain the term "Agreement."   The warrants are not signed by both parties, either.  However, despite the warrant's appearance as a type of certificate, courts have treated warrants as binding contracts.  As one court said, "A warrant is just a fancy name for a particular type of contract. . . . [I]t is fairly clear that the holder of a warrant has a property right it can enforce through specific

---

[53] <u>Crabtree v. Aetna Cas. & Sur. Co.</u>, 438 So. 2d 102, 105 (Fla. 1st DCA 1983).

performance of the share issuance."[54]  In exchange for Katzman's promise to work full time, Comprehensive Care issued the warrants and obligated itself to sell stock to the Katzman children at a specified price under specified conditions.  Therefore, the warrants are not unilateral contracts that can be cancelled by one party.  The warrants are legally enforceable contracts that bind Comprehensive Care.

 If Comprehensive Care's rescission claim fails, then no genuine issue of material fact remains for a jury to decide the breach allegation.  It is undisputed that Comprehensive Care breached the warrants by cancelling them without authorization after the warrants vested.  However, a jury question remains about what damages, if any, to award Jared, Lee and Michelle Katzman for the breach.

## V.      **Amended Counter-Claim Count V**: Indemnification Counter-Claim

### A.      *The Employment Agreement Requires Indemnification for This Lawsuit.*

Katzman moves for summary judgment on Count V of the Amended Counter-Claim, in which Katzman asserts that Comprehensive Care is contractually obligated to indemnify him for the cost of defending this lawsuit.  The Court agrees that the Employment Agreement requires Comprehensive Care to indemnify Katzman for his expenses and attorney's fees connected to this lawsuit.  However, it is premature to enter summary judgment on Count V.

Section 16 of the Employment Agreement between Comprehensive Care and Katzman is entitled "INDEMNIFICATION."  It reads:

---

[54] In re PurchasePro.com, Inc., 332 B.R. 417, 425 (Bankr. Nev. 2005) ("More specifically, [a stock warrant] is an option contract giving its holder the right to purchase shares of stock for a fixed price.").

> In addition to any liability insurance to be provided the Executive, the Company will indemnify Executive from any and all claims, demands, suits, actions or judgments which hereafter may by [sic] asserted, instituted or recorded by any person, firm or corporation made against Executive with respect to all expenses, losses, charges and attorney's fees sustained or incurred by the Executive in defending any suit, action or other proceeding brought against the Executive, directly or indirectly, arising out of Executive's employment by Company.[55]

"Indemnity contracts are subject to the general rules of contractual construction; thus an indemnity contract must be construed based on the intentions of the parties."[56]  The Employment Agreement says that Comprehensive Care intended to indemnify Katzman from "any and all" lawsuits "directly or indirectly, arising out of Executive's employment."  Comprehensive Care did not limit its exposure in the event that Comprehensive Care sued Katzman for breach of contract.  Nor did the Employment Agreement contain a provision, such as one shifting attorney's fees or requiring arbitration, governing a dispute about the contract itself.  The board of directors that approved the Employment Agreement consisted of sophisticated business executives well versed in corporate governance.  The Court must assume that the board meant what it said in the Employment Agreement.  Therefore, by approving the Employment Agreement, Comprehensive Care expressed its intention to indemnify Katzman for all lawsuits, including this one.

Comprehensive Care argues that several of the claims in this lawsuit do not arise "directly or indirectly" from Katzman's employment.  The Court disagrees.  Although some of Comprehensive Care's allegations concern Katzman's actions before signing the Employment Agreement, even these allegations arise "indirectly" from his employment.

---

[55] Doc. 184-1 (emphasis added).

[56] Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, (citing Univ. Plaza Shopping Ctr. v. Stewart, 272 So.2d 507, 511 (Fla.1973)).

Katzman also seeks indemnification under Florida Statute § 607.0850.  However, Florida

law does not provide an independent basis for indemnification.[57]  First, Florida law does not

apply to Katzman's Employment Agreement.  Although the Employment Agreement provides in

Section 10 that Florida law governs the agreement and any disputes under it, Florida law directs

the Court to Delaware for the source of corporate law governing this issue.  Florida Statute

§607.1505(3) provides that the Florida Business Corporation Act does not regulate the affairs of

a foreign corporation registered to conduct business in Florida.[58]  Because Comprehensive Care

is a Delaware corporation, Delaware law applies.  Therefore, Florida Statute § 607.0850 cannot

create a statutory basis for indemnification.[59]

Nevertheless, the Court cannot enter summary judgment on Count V of the Counter-

Claim.  "Contracts of indemnification which attempt to indemnify a party against its own

wrongful acts are viewed with disfavor in Florida.  Such contracts will be enforced only if they

express an intent to indemnify against the indemnitee's own wrongful acts in clear and

unequivocal terms."[60]  Neither party argues that the Employment Agreement would indemnify

---

[57] Florida Statute § 607.0850(1) reads: "A corporation shall have power to indemnify any person who was or is a party to any proceeding (**other than an action by, or in the right of, the corporation**), by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation. . . ." (Emphasis added.)

[58] Florida Statute § 607.1505(d) reads: "This act does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."  See also Mukamal v. Bakes, No. 08-14346, 2010 WL 1731775 (11th Cir. April 30, 2010).

[59] Delaware corporate law, which contains a statute similar to Florida Statute § 607.0850, does not provide for indemnification either.  See Del. Code Ann. tit. 8 § 145(a) (West 2010).  In fact, the Delaware Corporations Code, like Florida law, specifically excludes indemnification for an action by a corporation against one of its own directors or officers.  Therefore, no statutory basis for indemnification exists.

[60] Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip. Co., 374 So. 2d 487, 489 (Fla. 1979) (internal citations omitted). See also H&H Painting & Waterproofing Co. v. Mechanic Masters, Inc., 923 So. 2d 1227, 1228 (Fla. 4th DCA 2006) ("A contract is construed to indemnify an indemnitee against the indemnitee's own wrongful acts only where the contract expresses that intention 'in clear and unequivocal terms.'") (collecting cases).

Katzman from his own wrongful conduct.  Therefore, if the jury finds that Katzman acted wrongfully or the Court finds that the Employment Agreement should be rescinded, then he is not entitled to indemnification under the Employment Agreement.  Accordingly, summary judgment is premature.

**B.**    *The Employment Agreement Does Not Provide For Advancement.*

Comprehensive Care did not agree in the Employment Agreement to advance Katzman litigation expenses.  Nor can a right to advancement be read into the contract.  Indemnification and advancement are legally distinct concepts.  If the parties had agreed that Comprehensive Care would advance Katzman expenses, the parties would have expressed this intention in the Employment Agreement.  They did not.  Therefore, Katzman's claim to advancement fails.

In Katzman's summary judgment motion and in his Amended Counter-Claim, Katzman claims that Comprehensive Care's bylaws provide for an advancement of fees.  But Katzman has neither cited nor attached the bylaws to his summary judgment motion.[61]  Without the bylaws, the Court cannot grant Katzman summary judgment on this claim.

## CONCLUSION

The Katzmans' Amended Motion for Final Summary Judgment (Doc. 184) is **DENIED**.

The Joint Pretrial Statement is due on **August 3, 2010**; the Pretrial Conference is set for **August 6, 2010** at 8:30 a.m. in Courtroom 14A of the Sam M. Gibbons U.S. Courthouse in Tampa, Florida.  At the Pretrial Conference, the Court will set deadlines for the parties to promptly file motions in limine,  joint jury instructions, and a joint jury verdict form.

---

[61] This Court is under no obligation "to plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996).

**IT IS SO ORDERED.**

*Done on July 30, 2010.*

SUSAN C. BUCKLEW
United States District Judge